STATE, BY HARRY H. PETERSON, ATTORNEY GENERAL,
BY J. A. A. BURNQUIST, SUCCESSOR IN OFFICE, v.
JOHN W. BENTLEY AND OTHERS.
MARGARET V. KRAUS AND OTHERS, INTERVENERS.[1]

July 29, 1955.

Nos. 36,201, 36,202.

*Edwin C. Kraus, Carl J. Eastvold, E. V. Cliff,* and *George T. Havel,* for appellants.

*Miles Lord,* Attorney General, *Victor J. Michaelson,* Special Assistant Attorney General, for the State.

NELSON, JUSTICE.

Condemnation proceedings here involved were instituted in Big Stone county by the attorney general of the state of Minnesota to acquire necessary land for the construction of a dike, dam, and control works at the foot of Big Stone Lake and a diversion channel to divert the Whetstone River into Big Stone Lake. These proceedings were instituted in the year 1935 pursuant to L. 1935, c. 51, and

---

[1]Reported in 71 N. W. (2d) 780.

Ex. Sess. L. 1935-1936, c. 101. Another proceeding was instituted in Lac qui Parle county; a dam was also constructed below Marsh Lake and another below Lac qui Parle Lake on the Minnesota River. The project on Big Stone Lake was completed and placed into operation on April 13, 1937. No final certificate, however, has been filed in the above-described condemnation proceeding.

Petitions in intervention were filed by the Big Stone Canning Company, Margaret V. Kraus, and Edwin C. Kraus, the appellants herein, together with like petitions by Arthur Gerhardt, as administrator, Julius Christensen, Julia A. Fey, John de Neui, and Max Schmeichel. These causes were consolidated and tried together, and the trial court made identical findings of fact and conclusions of law in each case. These proceedings are enlargements of the original 1935 petition.

The Big Stone Canning Company and others were involved in the four appeals in State, by Peterson, v. Bentley, 216 Minn. 146, 12 N. W. (2d) 347. The petitioners in intervention, Big Stone Canning Company, Margaret V. Kraus, and Edwin C. Kraus, had not been made parties to the condemnation proceeding; they contend, however, that their lands were actually taken for the benefit and the use of the state of Minnesota and were taken without due compensation for the reason that the state of Minnesota by completing and putting into effect "F. A. 1-Big Stone-Whetstone Project" appropriated petitioners' premises as a reservoir for the impounding of waters and as a result have actually flooded the same; that the surface waters that normally accumulate on their premises are unable to drain and flow from said lands by reason of the creation of the state's project; that their premises have further been damaged by the seepage of waters from the reservoir created thereby, and as a direct result at least one-third of their lands have been rendered unfit for any purpose whatsoever and have so been taken by the state of Minnesota for all the purposes of the state's project; that the remainder of their lands, because of said facts, have been greatly damaged and diminished in value; and that the petitioners, appellants herein, are therefore entitled to have the lands so taken assessed

as to benefits and damages by the proper course of procedure in condemnation proceedings.

Pursuant to the decision of this court in State, by Peterson, v. Anderson, 220 Minn. 139, 19 N. W. (2d) 70, the state was granted the right to answer in each case; following consolidation of the cases and trial, findings of fact, conclusions of law, and order for judgment were entered by the trial court, denying relief to the petitioners upon the ground that no additional, or greater, amount of water flows past or upon petitioners' land by reason of the construction and operation of any of the projects mentioned in the proceedings, that petitioners' land would have been damaged in substantially the same manner in a state of nature, and that therefore none of the petitioners' land has been taken, damaged, or destroyed by the state of Minnesota. The petitions of the interveners were accordingly denied and dismissals entered with order for judgment accordingly. Big Stone Canning Company and Margaret V. and Edwin C. Kraus appeal.

The lands belonging to the Big Stone Canning Company involved herein are located in sections 16, 21, and 22 in township 121 N, range 46 W of the fifth principal meridian, Big Stone county, Minnesota, comprising approximately 334.71 acres. The lands of Edwin C. Kraus and Margaret V. Kraus are located in sections 16 and 21, same township, range, and county, comprising 111 acres of land.

The Whetstone project made changes to the Whetstone River, Big Stone Lake, and the Minnesota River. A limited description of the construction, operation, and maintenance of this flood control project is as follows: A dike was erected along the shore line at the foot of Big Stone Lake to an elevation of 976, a rise of ten feet from the low elevation that existed in a state of nature of 966. This project caused a diversion of the flow of the water of the Whetstone River, which formerly had its confluence with the Minnesota River at a point slightly over two miles below the foot of the lake, into Big Stone Lake by a diversion channel 180 feet in width. This diversion begins at a point where the Whetstone River comes out

of the hills on the South Dakota side and continues to the confluence with the Minnesota River just south of the Chicago, Milwaukee, St. Paul & Pacific Railway bridge over the river, a short distance downstream from the foot of Big Stone Lake, except for a two-foot culvert, which permits some water to go down the old channel of the Whetstone River. This diversion project enlarged the drainage area of Big Stone Lake, which in a state of nature was approximately 610 square miles, to 1,020 square miles.

The Minnesota River channel was widened and deepened starting from the foot of Big Stone Lake and running approximately one mile downstream to what was known as the old mill dam, where the Chicago, Milwaukee, St. Paul & Pacific spur track to Big Stone City crosses over the river. This increased the capacity of the channel for that distance, which was formerly 250 cubic feet per second, to approximately 1,000 cubic feet per second. As a result, for this distance the fall in the river channel is made more rapid than the fall downstream from the mill dam.

A control dam was erected across the Minnesota River just downstream from the confluence of the new diversion channel of the Whetstone River and the Minnesota River, thereby forcing the water of the diverted Whetstone up into Big Stone Lake. The control dam was built of concrete construction, and the over-all width of the spillway section of the dam is 105 feet, with a weir having a crest elevation of 966. Three movable gates were installed in the weir which can be lifted so as to permit water to pass through the resulting openings with a capacity of 750 cubic feet per second. The ground elevation of the river channel at the place where the dam was constructed was lowered approximately two feet so that water can be drained from the lake at a lower stage than it could in a state of nature. Provision is made in the upright sections of the dam in the weir slots for placing stop logs, these slots extending from the top of the weir to the floor of the spillway. The elevation of the top of the dam is 975. Extending in both directions from the dam structure are earthen dikes. The elevation of these dikes is 975 at the dam and for a very short distance of approximately 60 feet on either

side. There is a rise to an elevation of 979, and this elevation extends until it reaches the higher ground on both the South Dakota and Minnesota sides of the Minnesota valley. The dike extending to the South Dakota side of the valley from the control works runs immediately along the southerly and easterly bank of the diversion channel. This enables the state of Minnesota, by virtue of this project, to maintain and control the water elevation in Big Stone Lake to a maximum high of 975.

Prior to the construction of this project, the control point of water flowing out of Big Stone Lake was a higher elevation of ground extending across the valley about 1,000 feet below the point where the dam was constructed. The Minnesota River channel passing through that point had a capacity of 250 c.f.s. to an elevation of 970. The ground on each side of the channel gradually rises to an elevation of 972, and when the water reached that point, the flow spread across the entire valley. It was therefore, after the construction of the Whetstone project, possible to impound water of the greatly increased Big Stone Lake watershed in the lake to an elevation of 975 or the top of the control dam. The enlargement of the channel of the Minnesota River stopped downstream at the old mill dam and from that point on the Minnesota River capacity stayed at 250 c.f.s.

The construction of the diversion of the Whetstone and Big Stone Lake control dams, and the improved channel downstream therefrom for a distance of 4,000 feet, are not disputed since all of the plans and specifications for these improvements were received in evidence. The main point involved here in these appeals is the effect of these improvements upon the lands downstream therefrom, which includes those of the appellants. It is clear from the record that this was the principal point considered by the court below.

Before the diversion by this project and in a state of nature, the Whetstone River flowed through a precipitous gorge or ravine from the hills and higher ground in South Dakota. As the channel of this stream reaches the flat land at the state line it divides into two channels. The north or overflow channel, with a capacity of 750 c.f.s., extends northeasterly through section 16 and empties into

the Minnesota River at a point about one-half mile below the Big Stone control dam; the other channel of the Whetstone, with a capacity of 250 c.f.s., empties into the Minnesota River at a point two miles below Big Stone Lake. The channel capacity of the Minnesota River from its outlet at Big Stone Lake to Odessa, about seven river miles downstream, is approximately 250 c.f.s.

The ground elevation at the state line between Minnesota and South Dakota, where the Whetstone divides into two channels, is 970 feet, and there is an abrupt rise to the west to an elevation in excess of 1,000 feet. From the state line northeasterly to Big Stone Lake the elevation of the ground is approximately 970 feet. Most of the Big Stone Canning Company lands involved here lie below the confluence of the main channel of the Whetstone and the Minnesota Rivers; only a small part lies above the confluence but adjacent to the Whetstone River. The ground elevation of the Big Stone Canning Company's land fluctuates between 955 and 965.

The Kraus lands are all below the confluence of the old or overflow channels of the Whetstone and Minnesota Rivers and on the easterly side of the Minnesota River. The part of these lands which is in section 21 lies below the main channel of the Whetstone where it joins the Minnesota River within the same section. All parts of these lands belonging to the petitioners which are tillable are bottom lands and are located in the upper end of a platter-shaped basin bounded on the west by the South Dakota bluffs and on the east by bluffs or hills on the Minnesota side, and the distance between the foot of these bluffs varies from one mile to one and one-half miles. The ground elevation at the north end of this area, which begins at the outlet of Big Stone Lake and next to it, is between 965 and 970. The lower end of the area, which is about five and one-half miles downstream, has a ground elevation of 955 next to the river and rises sharply to an elevation in excess of 1,000 feet to the east and to the west more gradually reaching an elevation in excess of 960. Between the north and south ends and the high points on the east and the west of this area the ground is flat with potholes and depressions therein. The lowest area in that region is located in section 35

and is below elevation 945 and it is near the center of this platter-shaped basin.

The elevation applicable to the acreage of the other petitioners in intervention who did not appeal are as follows: Julia A. Fey, 965-970; Arthur Gerhardt, 960; John de Neui, except for bluff area, 955-960; Max Schmeichel, 950-960; Julius Christensen, 955-960.

There was admitted into evidence a petition in proceedings had in the year 1914 entitled Lac qui Parle Ditch No. 41. The report of the engineer and the plans and specifications therein were also received in evidence. Pursuant thereto ditches and laterals were constructed, including a series of dikes or embankments commencing on the lands of the Big Stone Canning Company along the Whetstone River and continuing downstream along the Minnesota River for a distance of about five miles. There was installed in connection with this ditch an automatic stop gate near the point where the ditch discharged into the Minnesota River. Its purpose was to prevent water from the river, when at approximately bankfull capacity, from backing up into the ditch. The main branch of this ditch commenced on the lands of the Big Stone Canning Company. That was in the year 1914, and in the year 1917 the Big Stone Canning Company and others in the area petitioned for the creation of a conservancy district, including the lands of the petitioners herein and other lands downstream therefrom. Findings and orders were entered by the district judges sitting therein, and the records in the two proceedings were made available for consideration by the trial court below.

All parties are agreed that the constitutional provision that private property cannot be taken, damaged, or destroyed for a public use without the payment of just compensation is applicable here. Minn. Const. art. 1, § 13. The question is whether there was interference under the right of eminent domain with either the ownership, the possession, or the enjoyment of petitioners' lands so as to constitute a taking within Minn. Const. art. 1, § 13; whether the flooding of the lands involved warrants an inference that there was a taking.

The burden rests upon the petitioners, who were not named in the original proceedings but came in by intervention, which they had a right to do, to establish by a fair preponderance of the evidence that there has in fact been a taking, and if so, the extent of such taking. The burden here does not rest upon the state to establish the effect of water conditions upon the lands involved caused by the Whetstone diversion project, its operation and maintenance, nor does the state assume the burden of segregating an effect of water conditions upon the lands involved resulting from rainfall, runoff, or other natural causes.

The questions involved are whether any additional or any greater amount of water flows past or upon petitioners' lands by reason of the construction and operation of any of the projects connected with the operation and maintenance of the Big Stone Lake control dam, and further whether the lands of the petitioners would have been damaged in substantially the same manner in a state of nature. A review of the testimony discloses conflicts in the evidence throughout.

The engineer who testified for the petitioners was the engineer under whose direction ditch No. 41 was designed and constructed beginning back in the year 1914. The engineer who testified for the state made a survey of the Minnesota valley territory in 1909 and 1910 beginning at Big Stone Lake and including the river area from that point to the city of Mankato on the Minnesota River. The maps prepared under the engineer's direction at that time were placed in evidence. The engineers on both sides were men of recognized ability in their field. The state's expert, Adolph F. Meyer, testified that all the lands of petitioners had been very substantially benefited by the diversion of the Whetstone into Big Stone Lake and that this diversion was definitely a benefit to the lands during the floodwater years of 1942, 1943, 1944, and 1945. He was supported in that view by Sidney A. Frellsen, the engineer in charge of hydraulics for the department of conservation for the state of Minnesota.

The testimony of Myron E. Chamberlin, who appeared as the expert in behalf of interveners, was to the effect that the water levels in Big Stone Lake during the years from 1937 to 1941 did not in any manner contribute to any damages to the lands of the peti-

tioners and that the dam was so operated during those years that appellants were protected and benefited. He differed with the experts testifying for the state as to the years 1942 and 1943 especially, which were the high flood years in all the period covered by the voluminous testimony in the record. For example, the rainfall for 1942, according to the record kept at the Milbank station, was 8.4 inches or 5.35 inches above normal in May of that year, and in June of the same year 4.43 inches, being .46 inches above normal. The Ortonville station recorded a rainfall of 7.73 inches for May 1942 and 3.87 inches for June 1942. The Sisseton station recorded a rainfall of 5.43 for May 1942, this being 2.36 inches above normal, and for June 1942, 5.23 inches, being 1.58 inches above normal. The station at Beardsley recorded a rainfall of 9.10 inches for the month of May 1942, being 6.06 inches above normal, and for the month of June, 4.12 inches, being .18 inches above normal.

It appears from the evidence that a rainfall of less than one inch occurring within either the drainage area of the Whetstone or the Little Minnesota River is at times sufficient to create a runoff in excess of the channel capacity of the Whetstone, the Little Minnesota, or the main channel below the lake.

The state's engineering witnesses, Meyer and Frellsen, lend persuasion that without the diversion of the Whetstone into Big Stone Lake the lands along the Whetstone River from the point where the same reaches the flat lands at the state line, including petitioners' lands and lands downstream therefrom, would have been subject to intermittent flooding during these years in a state of nature. The testimony of Mr. Meyer was to the effect that the rainfall during the years 1942, 1943, 1944, and 1945 was unparalleled.

Testimony was received as to what was known as the Whetstone flood in the month of June 1919 which lasted for two days and where the average discharge for two days was about 6,500 c.f.s. The area of Big Stone Lake at water elevation 966 is said to be about 12,500 acres, and it is contended on the part of the state that if the June 1919 flood had been diverted into Big Stone Lake it would have raised the water in the lake about two feet and that therefore under present conditions a similar flood could now, since the completion of

the Whetstone project in 1937, be stored in Big Stone Lake thereby preventing any property damage which might result from a flood not in excess of the one of June 1919.

Clearly, there is a marked difference in degree between the 1919 flood and the water conditions of the years 1942 and 1943. Rainfalls continued above average throughout 1944 and 1945. References made in the testimony to the report of petitioners' expert Mr. Chamberlin made in November 1919 upon the area in connection with which the Whetstone project was established, and the description by Mr. Chamberlin of the course of the Whetstone waters in excess of bank capacity as then given, is pretty much on a par with the description of the course of those waters by Mr. Meyer, the state's expert.

The conflict in the evidence between the engineer testifying for the petitioners and the engineers testifying for the state have to do with the years 1942 and 1943 especially, but on the whole cover the years 1942 to 1945 inclusive, and these on the question of whether or not the diversion of the Whetstone was definitely a benefit to the petitioners' lands during those floodwater years, and whether or not they were substantially benefited by the diversion of the Whetstone River into the lake. More than a half dozen lay witnesses appeared for each side. The situation in the area as to floodwaters was more or less thoroughly gone over, going back all the way to the years 1909 and 1910 and beyond. There was testimony that at times in a state of nature, at different periods of the year, areas herein involved, prior to 1937, were completely flooded and submerged to the extent that while it lasted passage across was often taken by boat. Petitioners' witnesses seem to stress the month of June in the year 1919 as the only flood of any consequence affecting the area to the extent of causing large scale damage. Witnesses for the state, long-time residents in that area, gave testimony which would indicate that there were many other times and periods when there was a flooding of the area, sometimes for short periods and at other times longer periods. In substance they testified that there were floods in the valley in the summer as well as in the spring in years prior to 1942, the effect of these floods being to prevent cropping of the

344

lands or at least to prevent good crops. Petitioners' witnesses limited the high-flood point of prior years largely to June 1919. All in effect are agreed, however, that, during the years 1937 to 1941 inclusive while operating under the Whetstone project, the diversion of the Whetstone into the lake had proved its value to the adjacent territory. Mr. Chamberlin, testifying as petitioners' expert on waters and drainage, admitted that in the years 1937 to 1941 the discharge from the Big Stone Lake into the Minnesota River channel did not exceed the channel's capacity and that the project was operated so as to save the lands downstream during those years. Further reference to the testimony of the witnesses or the documentary evidence submitted is unnecessary.

As this court said in Maust v. Maust, 222 Minn. 135, 137, 23 N. W. (2d) 537, 539, it is not "within our province, to go into an extended discussion of the evidence to prove or demonstrate the correctness of the findings of the trial court. Rather, our duty is fully performed when we have fairly considered all the evidence and from it have determined that it reasonably supports the findings."

In the trial of cases such as these, the primary responsibility of determining the fact issues necessarily rests with the trial court. We are and should be guided by the fact that much must necessarily be left to the sound judgment and the discretion of the trial court for it has the advantage, not possessed here, of being confronted with and fully hearing all the witnesses assisted by a complete view of all the circumstances surrounding the entire proceeding, as well as sitting in the locality and being upon the ground enhancing the opportunity of becoming more thoroughly familiar with the area involved. It is more capable under the circumstances of reaching a broad and clear understanding of the facts and the problems confronting the state and the landowners who are the petitioners here.

It is an established rule of this court that the findings of fact based on conflicting evidence will not be disturbed on appeal unless manifestly and palpably contrary to the evidence as a whole, even though we might make a different finding if we had the fact-finding function.

Where the decisive facts found by the trial court are sustained by the evidence, the supreme court need not discuss specifically other proposed findings of fact which would not change the result. 1 Dunnell, Dig. (3 ed.) § 414, and cases cited.

The question for the appellate court is whether the evidence as a whole reasonably tends to support the findings. If it does, they should not be disturbed. When an action is tried by a court without a jury, its findings of fact are entitled to the same weight as the verdict of a jury and will not be reversed on appeal unless they are manifestly and palpably contrary to the evidence, and this rule applies whether the appeal is from a judgment or from an order granting or denying a new trial, and whether the evidence is oral or documentary.[2] 1 Dunnell, Dig. (3 ed.) §§ 410, 411.

The function of a court of review is not to weigh the evidence as if trying the matter *de novo*, but to determine from an examination of the record if the evidence as a whole sustains the trial court's findings, and, if so sustained, it is immaterial that the record might also provide a reasonable basis for inferences and findings to the contrary.[3]

Upon the state of the record we are forced to reach the conclusion that the trial court's findings that no additional, or greater, amount of water flows past or upon petitioners' land by reason of the construction and operation of any of the projects mentioned in these proceedings and that petitioners' land would have been damaged in substantially the same manner in a state of nature finds support in the evidence and that therefore the petitioners' land has not been taken, damaged, or destroyed by the state of Minnesota.

[2]In re Psychopathic Personality of Dittrich, 215 Minn. 234, 9 N. W. (2d) 510; Alsdorf v. Svoboda, 239 Minn. 1, 57 N. W. (2d) 824; Marquardt v. Stark, 239 Minn. 107, 58 N. W. (2d) 273.

[3]Bond v. Stryker, 73 Minn. 265, 76 N. W. 26; Pike Rapids Power Co. v. Schwintek, 176 Minn. 324, 223 N. W. 612; Martens v. Martens, 211 Minn. 369, 1 N. W. (2d) 356; Brennan v. Friedell, 212 Minn. 115, 2 N. W. (2d) 547; Rebne v. Rebne, 216 Minn. 379, 13 N. W. (2d) 18; Bicanic v. J. C. Campbell Co. 220 Minn. 107, 19 N. W. (2d) 7, 220 Minn. 115, 20 N. W. (2d) 885, certiorari denied, 327 U. S. 787, 66 S. Ct. 805, 90 L. ed. 1014.

The evidence sustains the findings, conclusions, and order for judgment entered by the court below.

Affirmed.